### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARILYN C.,

      Plaintiff,

   v.

KILOLO KIJAKAZI,
    ACTING COMMISSIONER OF SOCIAL
    SECURITY,[1]

      Defendant.

No. 20 CV 1816

Magistrate Judge McShain

### MEMORANDUM OPINION AND ORDER

Plaintiff Marilyn C. brings this action under 42 U.S.C. § 405(g) for judicial review of the Social Security Administration's (SSA) decision denying her application for benefits. For the following reasons, the Court denies plaintiff's request to reverse the SSA's decision and remand this case to the agency [20],[2] grants the Commissioner of Social Security's (Commissioner) motion for summary judgment [25], and affirms the Commissioner's decision denying Plaintiff's application for benefits.

### Procedural Background

In late May 2017, plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging an onset date of August 26, 2016. [17-1] 16. Plaintiff's claims were denied initially and on reconsideration. [*Id*.]. Plaintiff requested a hearing, which was held by an administrative law judge (ALJ) on October 1, 2018. [*Id*.]. In a decision dated December 13, 2018, the ALJ ruled that plaintiff was not disabled. [*Id*.] 23. The Appeals Council denied review on December 16, 2019, making the ALJ's decision the agency's final decision. [*Id*.] 1-5. *See* 20 C.F.R. §§ 404.955, 404.981.

---

[1] In accordance with Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the Acting Commissioner of Social Security is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, with the exception of citations to the administrative record [17], which refer to the page numbers in the bottom right corner of each page.

Plaintiff timely appealed to this Court [1]. The Court has jurisdiction to review the Acting Commissioner's decision under 42 U.S.C. § 405(g), and the parties have consented to my jurisdiction over the case in accordance with 28 U.S.C. § 636(c). [7].

## Summary of Plaintiff's Medical and Non-Medical Evidence

Plaintiff was 52 years old when she applied for disability benefits due to a detached retina, retina surgery, dizziness, and a vision impairment. [17-2] 195. Before applying for benefits, plaintiff held a variety of work positions, including as an underwriting assistant, executive assistant, director of learner engagement, account executive, and account manager. [17-3] 197.

## Depression

The record contains evidence that plaintiff was diagnosed with severe major depression. [17-6] 534. Plaintiff was physically abused by one of her brothers and struggled in school due to undiagnosed ADHD. [*Id.*] 532. In her mid-twenties, plaintiff experienced post-partum depression and anxiety and was prescribed Zoloft. [*Id.*] 533. During this time she went to therapy. [*Id.*]. In her late twenties, plaintiff saw a psychiatrist who diagnosed her with ADHD and prescribed Adderall. [*Id.*] 532. Plaintiff stopped taking Zoloft in 2016 and did not take any prescribed psychotropic medications in September 2017, when she was examined by state agency clinical psychologist Jauren Kelly. [*Id.*] 532-34.

During the exam, Dr. Kelly noted that plaintiff was never hospitalized for mental illness and was not in any mental health treatment. [*Id.*] 533. Plaintiff reported that she applied for disability due to a "detached retina, retina surgery, dizziness, and vision impairment." [*Id.*] 532. Plaintiff described that she is "usually depressed and…has frequent crying episodes," difficulty sleeping, and worries about going blind. [*Id.*] 533. She also stated that she "enjoys spending time with her nephews" and recently started dating. [*Id.*]. Plaintiff's mental status exam revealed that she was "alert and oriented to person, place and time," and "cooperative." [*Id.*]. Dr. Kelly also found plaintiff's mood was depressed and her affect congruent. [*Id.*]. Dr. Kelly further observed plaintiff had an adequate fund of information and good insight but that she was unable to relate recent news events. [*Id.*] 533-34. Dr. Kelly ultimately diagnosed plaintiff with severe recurrent major depression with symptoms that included depressed mood, crying episodes, poor motivation, poor self-care, sleep difficulty, rumination, and isolative behavior. [*Id.*] 534. Finally, Dr. Kelly concluded that plaintiff is capable of handling her own financial affairs. [*Id.*].

In addition, non-examining state agency psychologists, Russel Taylor and Steven Fritz, each conducted mental RFC evaluations of plaintiff and concluded plaintiff's depression was non-severe on September 20, 2017 and March 14, 2018, respectively. [17-1] 69, 81-82. Both psychologists' evaluations assigned plaintiff mild

limitations in: understanding, remembering of applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. [*Id.*] 67, 80. Dr. Taylor and Dr. Fritz each explained, plaintiff "does not allege a mental condition and she is not in treatment and does not take psychotropic medication and has not for two years . . . While she was [diagnosed with] depression at the one-time [consultative psychological examination], she is not in treatment and does not have cognitive or social limitations." [*Id.*] 68, 81.

Plaintiff also completed a function report noting her mental health difficulties. [17-2] 183-90. Plaintiff described that her vision problems caused two panic attacks, difficulty sleeping, and anxiety. [*Id.*] 184, 189. Further, because she must walk with one eye closed, plaintiff is uncomfortable and nervous in crowds. [*Id.*] 188. Plaintiff reports that her impairments affect her concentration. [*Id.*] However, plaintiff admitted that she is not on her ADHD medication because she does not have insurance. [*Id.*] When she is on her medication, plaintiff stated she can follow written instructions well. [*Id.*]. Plaintiff also stated that she cares for her three- and two-year-old nephews and interacts with others daily. [*Id.*] 184, 187. On October 1, 2018, plaintiff testified at the administrative hearing. [17-1] 30-54. Plaintiff did not mention her prior diagnoses of major depression or ADHD, any treatment, or symptoms she experienced associated with either disorder. [*Id.*].

**Vision Problems**

In June 2016, plaintiff began experiencing floaters and sudden flashes of light in her left eye. [17-3] 292. Plaintiff saw an optometrist, Dr. Rabia Awan, who stated these symptoms were due to age and plaintiff did not further investigate her symptoms. [17-3] 292; [17-5] 430. Two months later, plaintiff experienced a sudden loss of central vision in her left eye and worsening floaters and light flashes. [17-3] 292. Plaintiff visited ophthalmologist, Dr. Jose Garcia Gonzalez, who diagnosed plaintiff with a "macula off retinal detachment in the left eye" and bilateral vitreous degeneration. [*Id.*] 293. Dr. Garcia recommended immediate surgery. [*Id.*]. That same day Dr. Garcia operated on the plaintiff, performing a pars plana vitrectomy, air-fluid exchange, endolaser, and SF6 placement to remove vitreous gel from her left eye and reattach her retina. [*Id.*] 269, 272.

The next day plaintiff reported to Dr. Garcia's colleague, ophthalmologist Dr. Michael Blair, that she could see light, colors, and objects, but the objects are blurry. [*Id.*] 295. Two weeks after the surgery plaintiff returned to Dr. Garcia, for re-evaluation. [17-4] 299. Dr. Garcia remarked "everything appears to be stable and the retina is attached." [*Id.*]. Plaintiff told Dr. Garcia that she felt her overall vision in her left eye "slightly improved" since her last visit. [*Id.*] 298. She no longer experienced floaters, light flashes, lights, or colors. [*Id.*]. A week after plaintiff's re-evaluation she returned to Dr. Garcia because in her left eye plaintiff saw a bubble and everything looked blurry. [*Id.*] 301. She also reported an intermittent black dot

and light sensitivity, also in her left eye. [*Id.*]. On examination, plaintiff's visual acuity was limited to counting fingers and she was unable to see her daughter except when far away and without her glasses. [*Id.*] 302. Dr. Garcia suspected plaintiff had a severe myopic shift and would need corrective glasses. [*Id.*]. Dr. Garcia told plaintiff not to be concerned, that he would continue to observe her, and if her vision did not improve, refer her for refraction. [*Id.*]. At plaintiff's third re-evaluation, plaintiff reported that her vision improved but was still blurry and that she experienced double vision when both eyes are open. [*Id.*] 304. Plaintiff continued to describe an intermittent black dot and light sensitivity in her left eye. [*Id.*]. Dr. Garcia observed "everything appears to be stable" and that her visual acuity improved to 20/400, pinhole to 20/150. [*Id.*] 305. Dr. Garcia remarked that he was "hopeful . . . her vision [would] continue to improve" and recommended time off-work while her visual acuity improves. [*Id.*]. During plaintiff's fourth re-evaluation, plaintiff continued to report that her vision was improving but, it is still blurry. [*Id.*] 307. Plaintiff again described double vision when both eyes are open, light sensitivity and an intermittent black dot in her left eye. [*Id.*] 307. Plaintiff also reported seeing a "green light and circles around it." [*Id.*]. Once again, Dr. Garcia noted plaintiff's vision improved and that while the retina had mild changes to photoreceptors, that should improve with time, allowing her vision to improve. [*Id.*] 308. In plaintiff's fifth evaluation re-evaluation plaintiff reported the same symptoms, with Dr. Garcia noting "vision is not as good as we would like it to be" and recommending plaintiff obtain a refraction or cataract evaluation. [*Id.*] 310-11. Almost two months later, plaintiff returned for her sixth re-evaluation, reporting no changes to her vision since her last visit in late October 2016. [*Id.*] 313. On examination, Dr. Garcia noted that on near card reading, without her glasses, she could read to 20/50 with severe metamorphopsia. [*Id.*] 314. Dr. Garcia explained that severe metamorphopsia was likely caused by dense epiretinal membrane and recommended surgically removing the membrane. [*Id.*].

Before plaintiff's second eye surgery Dr. Michael Miller completed a pre-operative examination of plaintiff. [17-5] 412-14. Dr. Miller reported that aside from the scheduled surgery, "she has otherwise been in good health." [*Id.*] 413. Dr. Miller also noted plaintiff's "functional capacity is excellent" and that she "[c]an walk several blocks and climb several flights of stairs without limitations." [*Id.*]. Regarding plaintiff's eyes, Dr. Miller observed plaintiff had a "normal optic disk." [*Id.*] 414.

On January 5, 2017, Dr. Garcia operated on plaintiff, removing the membrane. [17-4] 316. The next day plaintiff denied seeing any flashes of light, floaters, or distortion. [*Id.*]. Two weeks after the surgery plaintiff returned to Dr. Blair, for re-evaluation. [*Id.*] 319. Plaintiff reported blurry vision, and a bubble, black tiny spots, and a glare of light in her left eye. [*Id.*]. During plaintiff's second re-evaluation she reported that her vision remained unchanged since the last visit but had light sensitivity in both eyes. [*Id.*] 322. Dr. Garcia remarked that "everything appears to be stable . . . her pressure is within normal limits [and] [h]er contour has improved greatly." [*Id.*] 323. In February 2017, Dr. Garcia completed an assessment of plaintiff.

[17-5] 428-29. Dr. Garcia concluded plaintiff could stand, sit, walk, and drive between five and eight hours a day, lift up to twenty pounds, carry up to ten pounds, and use her upper extremities for simple grasping, pushing, pulling, and fine manipulation. [*Id.*] 429. Dr. Garcia also found plaintiff did not have any mental limitations. [*Id.*]. While plaintiff had not achieved maximum medical improvement, Dr. Garcia added she would achieve this within four weeks and included a return-to-work date of March 15, 2017. [*Id.*]

At plaintiff's third re-evaluation, in March 2017, plaintiff reported her vision slightly worsened, describing floaters in her right eye, double vision and halo effect in her left eye, and light sensitivity in both eyes. [17-4] 328. Dr. Garcia remarked "everything appears to be stable" and her "OCT scans have shown fewer corrugations." [*Id.*] 329. Dr. Garcia tested her vision in her left eye with near card and pinhole reading and she was able to read 20/25+, leading Dr. Garcia to conclude that he was "confident that her visual acuity will improve after cataract extraction." [*Id.*]. Two months later, in May 2017, at plaintiff's fourth re-evaluation, plaintiff recounted the same symptoms. [*Id.*] 331. Dr. Garcia again stated "everything appears to be stable" and "cleared for cataract extraction" for August 2017. [*Id.*] 332.

In August 2017, plaintiff underwent a third surgery on her left eye to extract a cataract and insert an intraocular lens. [17-6] 506. The day after plaintiff's vision tested 20/30 in her right eye and 20/70-2 in her left eye. [*Id.*] 518. A week after surgery, plaintiff returned for a re-evaluation with ophthalmologist Dr. Michael Giovingo who remarked plaintiff was "doing well." [*Id.*] 509, 513.

Several months later, in January 2018, plaintiff returned to Dr. Garcia reporting her vision was as it had been before her August 2017 surgery. [*Id.*] 544. Plaintiff described experiencing floaters, an occasional white bubble, and double vision in her left eye. [*Id.*]. She described her vision as "looking through a foggy glass." [*Id.*]. Plaintiff's distance vision tested 20/20 in her right eye and 20/80 in her left eye. [*Id.*]. Dr. Garcia noted plaintiff was treated for conjunctivitis in her left eye and "everything appears to be stable." [*Id.*] 545. Three months later, in April 2018, plaintiff visited ophthalmologist Dr. Ramez Haddadin who noted plaintiff's condition "dramatically improved" and that her vision, including pinhole vision was "actually better" [17-7] 646-47. Dr. Haddadin tested plaintiff's vision which was 20/25 in her right eye, 20/200 in her left eye. [*Id.*] 644.

In addition, non-examining state agency physicians, Richard Bilinsky and Vidya Madala conducted physical medical evaluations of plaintiff and concluded plaintiff's visual impairment was non-severe on October 4, 2017 and March 21, 2018 respectively. [17-1] 66, 79. Dr. Bilinsky remarked plaintiff has "limited vision . . . . due to . . . retinal detachment and cataract. However, since the claimant's vision in the better eye is 20/20-2, the allegation is non-severe." [*Id.*] 66. Consistent with Dr. Bilinsky's reasoning, Dr. Madala found on reconsideration plaintiff's impairment was

still non-severe as plaintiff's "vision remains 20/20-2 with full [visual field]." [*Id.*] 79.

In plaintiff's function report, she describes an inability to see clearly out of her left eye, "black floaties in [her] right eye," and "double vision." [17-2] 183. Plaintiff states because of her vision problems she can no longer "drive, workout, [or] read computer screens" and she does not go anywhere alone. [*Id.*] 184, 188. Plaintiff's daily activities consist of helping care for her nephews, including reading to them, cleaning, such as laundry and dishes, going for walks outside, watching television, and preparing meals. [*Id.*] 184-85, 187. Plaintiff noted these activities take her a "normal [amount of] time." [*Id.*] 185.

At the administrative hearing, plaintiff testified about her vision issues, stating in her left eye she could "see blurs of colors," "like having Vaseline over [her] eye." [17-1] 43. She also described experiencing a "fan spinning" in the middle of her left iris first thing when she wakes up and she walks. [*Id.*] 43-44. Plaintiff testified her vision improved after her cataract surgery but has since worsened. [*Id.*] 44. She also described that a new bulge was forming in the back of her retina causing her to see "white bubbles" in the corner of her left eye between one and three times a day. [*Id.*] 45. In her right eye, plaintiff testified to experiencing constant "black floaties," which worsen after physical activity [*Id.*] 44, 47. Plaintiff stated these vision problems make daily activities like reading and watching television difficult. [*Id.*] 47. She added she no longer exercises, paints, or does arts and crafts. [*Id.*] 49. However, plaintiff also stated she does not have problems using her smartphone. [*Id.*] 48-49. Plaintiff reported she can text and read her phone for twenty minutes at a time. [*Id.*] 49. After twenty minutes, plaintiff said she needs to rest for forty-five minutes before she can resume reading. [*Id.*] 51. Plaintiff testified she spends an hour and forty-five minutes on her phone daily and can read up to four hours a day. [*Id.*] 51, 53-54.

Apart from vision problems, plaintiff described tiring easily, being clumsy with her hands, feeling dizzy, and experiencing pain or numbness in her feet. [*Id.*] 47, 51-52. When asked why she has not sought medical treatment for these symptoms, plaintiff explained she has not had medical benefits or insurance since her last eye surgery in 2016. [*Id.*] 52. Plaintiff also stated twice a week she goes on a three mile walk by herself [*Id.*] 48. When asked whether she could return to her online gaming job full-time, plaintiff said "if I had a huge screen, possibly." [*Id.*] 49.

## Legal Standard

Under the Social Security Act, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

6

To determine whether a claimant is disabled, the ALJ conducts a sequential five-step inquiry: (1) whether the claimant has performed any substantial gainful activity during the period for which he claims disability; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairment; (4) whether the claimant can perform his past relevant work (i.e., the claimant retains the residual functional capacity (RFC) to perform his past); and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience (i.e., able to perform any other work existing in significant numbers in the national economy). *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that the claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

"The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. §405(g). Substantial evidence is a standard that "requires more than a mere scintilla of proof and instead such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walker v. Berryhill*, 900 F.3d 479, 482 (7th Cir. 2018). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted); *see also Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) ("When an ALJ recommends that the agency deny benefits, it must first 'build an accurate and logical bridge from the evidence to the conclusion.'") (internal citation omitted).

## The ALJ's Decision

At Step One, the ALJ found that plaintiff had not performed substantial gainful activity since her alleged onset date of August 26, 2016. [17-1] 18. At Step Two, the ALJ determined that plaintiff did not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for twelve consecutive months. [*Id.*]. The ALJ found while plaintiff did have several medically determinable impairments that could reasonably be expected to produce her alleged symptoms, plaintiff's statements concerning "the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." [*Id.*] 20.

In making this finding the ALJ considered plaintiff's administrative hearing testimony and medical evidence, specifically: (a) plaintiff's function report; (b) plaintiff's disability report; (c) treatment notes from plaintiff's visits to the ophthalmologist; (d) Dr. Garcia's February 2017 functional assessment of plaintiff and (e) plaintiff's off-work or return to work notices. [*Id.*] 19-21. Regarding plaintiff's physical issues, the ALJ noted inconsistencies between plaintiff's self-purported limitations and plaintiff's daily activities. [*Id.*] 20. For instance, plaintiff reported difficulty watching television and looking at a computer screen, but she also stated she can read up to four hours a day and use her smartphone without difficulty. [*Id.*]. The ALJ also pointed out plaintiff's treatment notes regularly reported improved or normal vision. [*Id.*] 20-21. Regarding plaintiff's depression, the ALJ focused on plaintiff's failure to seek treatment and mention her mental health issues at the administrative hearing. [*Id.*] 21. The ALJ also highlighted that no psychologist found plaintiff had any mental limitations. [*Id.*] 21-22.

During Step Two, the ALJ also considered whether plaintiff's mental impairments satisfied the "Paragraph B" criteria. [*Id.*]. The ALJ found plaintiff has mild limitations in all four areas of mental functioning. [*Id.*] 22. As to understanding, remembering, or applying information, the ALJ noted plaintiff does not allege memory problems and is able to understand and follow instructions. [*Id.*] Next, the ALJ found plaintiff's limitation in interacting with others mild as plaintiff has no problems getting along with family, friends, neighbors, or authority figures. [*Id.*]. As to adapting or managing oneself, the ALJ found a mild limitation appropriate because plaintiff has no problems with personal care, she cares for her nieces and nephews, and completes housework [*Id.*]. Lastly, the ALJ found plaintiff has a mild limitation as to concentrating, persisting, or maintaining pace, reasoning that while plaintiff has ADHD, she can handle her own finances, read, and watch television. [*Id.*].

The ALJ also discussed whether she found the opinions of medical experts in this matter persuasive, and her reasoning, as follows:

- The ALJ found persuasive the opinions of non-examining state agency psychological consultants who each concluded plaintiff's mental impairment is not severe. [*Id.*] 22. The ALJ explained their conclusion is well-supported as plaintiff has had no psychological treatment, she does not allege mental functional limitations, and her consultative psychological examination with Dr. Kelly was "largely unremarkable." [*Id.*].

- The ALJ also found persuasive the opinions of non-examining state agency physician consultants because the opinions cited to the medical record and were consistent with the record. [*Id.*] 21.

- The ALJ did not find persuasive treating physician Dr. Garcia's 2017 functional capacity assessment. [*Id.*]. The ALJ explained while Dr. Garcia

concluded plaintiff was limited to carrying up to 20 pounds, he did not identify other functional limitations and stated plaintiff could return to work in a month [*Id*.]. Further, Dr. Garcia did not specify whether the lifting restriction was related to plaintiff's second eye surgery or something else. [*Id*.].

The ALJ ultimately concluded none of plaintiff's physical or mental impairments, considered singly or in combination, significantly limited her ability to perform basic work activities. Therefore, plaintiff did not have any severe impairment or combination of impairments, necessitating a finding of not disabled. [*Id*.] 22-23.

### Discussion

Plaintiff argues the ALJ's decision should be remanded for further proceedings because the ALJ's conclusion that plaintiff does not have a severe impairment or combination of impairments was not supported by substantial evidence. [27] 1. Additionally, she contends the ALJ committed several legal errors necessitating a remand. First, plaintiff maintains the ALJ erred when she discredited treating physician Dr. Garcia's opinion and credited the state agency physicians' opinions. [20] 6. Second, plaintiff alleges the ALJ committed two errors in assessing plaintiff's credibility: (1) the ALJ inaccurately described plaintiff's daily activities and did not explain inconsistencies among those daily activities, her subjective complaints, and medical evidence in the record; and (2) the ALJ inappropriately relied on plaintiff's lack of treatment for her depression without addressing plaintiff's reasons for not pursuing treatment. [20] 9-11.[3]

The Court will address each of plaintiff's arguments below. Ultimately, on careful review of the parties' briefing, the ALJ's opinion, and the administrative record, the Court finds substantial evidence supported the ALJ's decision and the ALJ did not commit any errors warranting remand.

## I. Substantial Evidence Supports the ALJ's Conclusion that Plaintiff Does Not Have a Severe Impairment or Combination of Impairments.

At step two of the disability evaluation process, an ALJ determines whether a claimant's medically determinable impairments, individually or in combination are severe. *See generally Castile v. Astrue*, 617 F. 3d 923, 926 (7th Cir. 2010); 20 C.F.R. § 404.1521. A severe impairment is an impairment or combination of impairments that "significantly limit[s] [one's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a). "Basic work activities" include walking, standing, sitting, pushing, and handling; capacities for seeing, hearing, and speaking; understanding,

---

[3] Plaintiff also argues the alleged errors were not harmless because if the ALJ proceeded in the analysis to Step 5, the ALJ could not have found jobs in the economy plaintiff could have performed necessitating a finding of disability. [*Id*.] 13-14. Because the Court finds the ALJ did not commit any errors, the Court need not address this argument.

carrying out, and remembering simple instructions; and responding appropriately to supervision and co-workers. *See* 20 C.F.R. § 404.1522(b). Conversely, an impairment is not severe when the evidence establishes "only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered." Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (S.S.A. 1985). If the ALJ determines that a claimant does not have a severe impairment or combination of impairments, the analysis stops at step two and the ALJ finds the claimant is not disabled. *See Vaile v. Chater*, 916 F. Supp. 821, 827 (N.D. Ill. 1996) (internal citation omitted).

Here, the ALJ conducted a review of the medical and opinion evidence related to all of plaintiff's claimed impairments and found plaintiff's medically determinable impairments–detached retina of the left eye, status post cataract surgery of the left eye, and depression–did not significantly limit plaintiff's ability to perform basic activities, and thus, were not severe individually or in combination. [17-1] 22.

Plaintiff asserts the ALJ made two errors in coming to this conclusion. First, plaintiff contends the ALJ failed to follow the appropriate steps during the Step Two analysis because the ALJ considered plaintiff's subjective symptoms first and then "looked to whether the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." [20] 6. Second plaintiff argues the ALJ's conclusion is unsupported by substantial evidence because the ALJ "cherry picked" the record, ignoring evidence that would establish plaintiff's impairments are severe. [*Id.*]. The Court is unpersuaded by either argument.

### a. ALJ's Inclusion of Boilerplate Language is Not Reversible Error Where ALJ Offered Evidence-Based Reasons for Conclusion.

At the outset, plaintiff argues the ALJ erred in conducting the Step Two analysis when she considered plaintiff's "subjective symptoms first and then looked to whether the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," when Step Two requires the ALJ evaluate the "medical evidence alone . . . to assess the effects of the impairments on [plaintiff's] ability to do basic work activities." [*Id.*] 5-6 (quoting SSR 85-28). As proof, plaintiff points to the ALJ's statement:

After considering the evidence of record, I find that [plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, [plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

10

[17-1] 20.

In support, plaintiff cites *Filus v. Astrue*, where the Seventh Circuit criticized the ALJ's inclusion of similar language, however, ultimately affirmed plaintiff's denial of disability benefits. 694 F.3d 863, 868-69 (7th Cir. 2012). There, the Court took issue with the ALJ's phrase "claimant's statements . . . are not credible to the extent they are inconsistent with the *above* [RFC] assessment" where the RFC assessment was not above but, in the following paragraphs of the ALJ's decision. *Id.* (emphasis added). Because in those following paragraphs the ALJ offered "reasons grounded in the evidence" and "otherwise explained his conclusion adequately" the Court found the ALJ's inclusion of the criticized language harmless and not warranting reversal. *Id.* While the ALJ in the instant case does use similar boilerplate language to the ALJ in *Filus*, unlike in *Filus*, the ALJ here did not "pu[t] the cart before the horse." *Id.* Instead, the phrase previews the ALJ's Step Two conclusion that she explains in the decision's next two pages. [17-1] 20-22; *see also Stile v. Colvin*, 2017 WL 2908783, at *4 (N.D. Ill. July 7, 2017) (ALJ's use of boilerplate language was not reversible error where language was used to summarize "the relevant points of law, which the ALJ followed with lengthy paragraphs" that discussed the evidence and "contained logical analysis."). To underscore this point, the ALJ includes in the targeted phrase, "I find . . . for the reasons explained in this decision." [*Id.*] 20. Because the ALJ did offer reasons for her conclusion, the Court proceeds to examine whether substantial evidence supported the ALJ's decision to find plaintiff's impairments not severe.

### b. The ALJ Built an Accurate and Logical Bridge to Her Conclusion.

The Court finds the ALJ built the requisite logical bridge between the medical evidence and her conclusion that none of plaintiff's impairments, individually or in combination, are severe. For both plaintiff's mental and physical impairments, the ALJ conducted a thorough review and discussion of the evidence in the record. Regarding plaintiff's depression, the ALJ's conclusion is well-supported by evidence considering plaintiff no longer takes anti-depressant medication or otherwise pursues treatment, no psychologist imposed mental limitations, and plaintiff did not mention her mental health issues when she testified at the hearing. Regarding plaintiff's vision issues, the record supports the ALJ's conclusion given that plaintiff's treatment records demonstrate her vision improved or remained normal and her symptoms cleared up with surgery and over time. The Court concludes the ALJ's conclusion that plaintiff's impairments are not severe is supported by substantial evidence.

### i. Mental Impairment: Depression

The ALJ's finding that plaintiff's depression is not severe is supported by substantial evidence. The ALJ explained plaintiff had not received any mental health

treatment, such as medication, counseling, outpatient treatment, or treatment by a psychiatrist. [17-1] 21-22. The ALJ also noted plaintiff did not mention her mental health issues when she testified at the administrative hearing. [*Id.*] 21. The ALJ acknowledged that Dr. Kelly diagnosed plaintiff with major depression and that she experienced symptoms including crying episodes, sleep difficulty, poor motivation, and isolative behavior. [*Id.*]. However, the ALJ noted that Dr. Kelly did not go onto identify any specific mental functional limitations. [*Id.*]. The ALJ observed that during plaintiff's exam with Dr. Kelly, plaintiff's speech was normal, she could recall 3/3 objects after a delay, and perform simple mental calculations. [*Id.*]. The ALJ's decision includes an analysis of plaintiff's mental functioning, using the "paragraph B" criteria found in regulations. [*Id.*]. 21-22 (citing 20 C.F.R. § 404, Subpt. P, App. 1). As stated above, the ALJ found that plaintiff has mild limitations in all four areas of mental functioning in light of plaintiff's lack of memory problems and her ability to understand and follow instructions, handle her finances, read, and watch television. [*Id.*] 22. The ALJ further found mild limitations appropriate given that the record evidence demonstrated that plaintiff has no problems getting along with others and no problems with personal care. [*Id.*]. Finally, the ALJ discussed non-examining state agency psychologists, Dr. Fritz's and Dr. Taylor's conclusion that plaintiff's mental impairment is not severe. [*Id.*].

The Court summarizes the ALJ's analysis here at some length to demonstrate that the ALJ did exactly what she was required to do: she reviewed and discussed the relevant and objective medical evidence related to plaintiff's claimed mental impairment, and found while the impairment was documented, there was not sufficient evidence in the record to support plaintiff's claim that this impairment caused significant limitations on her ability to perform basic work activities.

Plaintiff suggests the ALJ failed to confront certain favorable evidence, specifically that plaintiff suffered from major depression and had two panic attacks related to issues with her vision, but this too is not grounds for a remand. [20] 10. First, the ALJ explicitly acknowledged that plaintiff suffers from major depression. [17-1] 21. Second, while it is true the ALJ did not specifically discuss plaintiff's panic attacks, the ALJ repeatedly cited to the entire exhibit that mentioned these panic attacks and discussed other record evidence that mentions plaintiff's mental distress. [17-1] 19, 21-22. Here, plaintiff's panic attacks are mentioned one time in the administrative record, in plaintiff's function report. [17-2] 189. The ALJ cites this report at least six times and includes excerpts favorable to plaintiff, such as her nervousness in crowds and difficulty concentrating. [17-1] 19, 21-22. The ALJ also noted that during Dr. Kelly's examination, plaintiff reported "experiencing depression with crying episodes, sleep difficulty, poor motivation, and isolative behavior." [*Id.*] 21.

The Court also finds the Commissioner's citation to *Randall M. v. Berryhill* persuasive in concluding that the ALJ's failure to discuss plaintiff's panic attacks

does not warrant a remand. No. 18-cv-2101, 2019 WL 2473829, at *5 (N.D. Ill. June 13, 2019); [26] 6. In *Randall M.*, claimant appealed his denial of disability benefits arguing in part that the ALJ committed reversible error when the ALJ's decision did not discuss claimant's testimony that he needed to lie down for 60-90 minutes. [*Id.*]. The Court found the ALJ's omission harmless error because the subjective complaint showed up only in claimant's hearing testimony and was not supported anywhere else in the administrative record. [*Id.*]. Like in *Randall M.*, plaintiff's claim that she suffered two panic attacks is a subjective complaint mentioned once in the administrative record. [17-2] 189. Similar to *Randall M.*, the record here demonstrates the ALJ's opinion was supported by medical records, including: opinions of two non-examining state agency psychologists' that plaintiff's depression was not severe; the opinion of an examining state agency psychologist that plaintiff did not have any mental limitations; and plaintiff's lack of treatment. [17-1] 21. As the Commissioner points out, the psychologists' opinions were uncontradicted by any medical opinion and plaintiff does not challenge them. [26] 4. The Court thus finds the ALJ's failure to consider plaintiff's subjective complaint harmless error. The Court notes that "[a]lthough an ALJ may not ignore an entire line of evidence in reaching [her] opinion, [she] also 'need not mention every piece of evidence, so long [as she] builds a logical bridge from the evidence to [her] conclusion." *Poole v. Colvin*, No. 12 C 10159, 2016 WL 1181817, at *7 (N.D. Ill. Mar. 28, 2016) (quoting *Denton v. Astrue*, 596 F. 3d 419, 425 (7th Cir. 2010)). Here, the ALJ considered plaintiff's testimony and the records documenting her mental distress, but found that, based on her review of the entire record, plaintiff's mental impairment was not severe. Considering the whole record, the Court finds the ALJ sufficiently reviewed and discussed the medical evidence, including evidence favorable to plaintiff, and built an accurate and logical bridge to her conclusion that plaintiff's mental impairment was not severe. Under the deferential standard of review the Court is required to follow, this is sufficient. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

Finally, plaintiff suggests plaintiff's diagnosis of major depression is sufficient to establish plaintiff's mental impairment is severe under Step Two. Plaintiff's assertion, quoting *O'Connor -Spinner v. Colvin*, that "no court had found a diagnosis of "major depression" to be classified as non-severe," is contradicted by several decisions out of this circuit. 832 F.3d 690, 697 (7th Cir. 2016). *See Kasarsku v. Barnhart*, 335 F.3d 539, 544-45 (7th Cir. 2003) (ALJ did not commit reversible error in concluding claimant's diagnosed depression was not a severe impairment considering claimant no longer received treatment or took anti-depressants); *Lott v. Colvin*, 541 Fed. App'x 702, 705-06 (7th Cir. 2013) (ALJ did not commit reversible error in concluding claimant's diagnosed depression was not a severe impairment considering claimant's daily activities and the requirements of her part-time job); *Schwabe v. Barnhart*, 338 F. Supp. 2d 941, 960-961 (E.D. Wis. 2004) (ALJ did not commit reversible error in concluding claimant's diagnosed depression was not a severe impairment considering claimant's examining psychologist did not suggest

any mental limitations or treatment, claimant no longer took medication, and she testified her psychological problems cleared up).

The Court finds the result in *Kasarsky* instructive. In *Kasarsky*, claimant appealed his denial of disability benefits arguing in part that the ALJ committed reversible error when the ALJ did not find plaintiff's diagnosed major depressive disorder a severe impairment. 335 F.3d at 544. The Court found the ALJ's decision on this point supported by substantial evidence reasoning that despite claimant's diagnosis, he no longer saw a psychologist for treatment or took anti-depression medication, and no doctor "commented on the lingering effects" of his diagnosis. *Id.* Similar to the claimant in *Kasarsky*, plaintiff had not seen a psychologist for treatment since her twenties, she stopped taking prescribed anti-depressant Zoloft in 2016, almost two years before her administrative hearing in October 2018, examining psychologist Dr. Kelly did not find plaintiff's depression created any mental limitations, and plaintiff did not mention her diagnosis or mental health issues when she testified at the hearing. [17-6] 532-34. The Court finds no reason to second-guess the ALJ's conclusion that plaintiff's diagnosed major depression is not a severe impairment and that this conclusion is supported by substantial evidence.

### ii. Physical Impairment: Vision Problems

The ALJ's finding that plaintiff's vision impairments are not severe is also supported by substantial evidence. As with the ALJ's discussion of plaintiff's depression, the ALJ determined plaintiff's visual impairments are not severe after she discussed the medical record evidence, plaintiff's subjective complaints, and treatment notes. [17-1] 19-21. The ALJ found the record evidence showed plaintiff's vision generally improved or was normal, pointing out that throughout the relevant period plaintiff's visual fields remained normal as well as her right eye vision which tested between 20/20 and 20/30. [*Id.*] 20-21, 79; [17-6] 518, 544; [17-7] 644. Regarding plaintiff's left eye vision, the ALJ noted plaintiff's vision gradually improved following plaintiff's eye surgeries, referencing treating ophthalmologists Dr. Garcia's and Dr. Haddadhin's re-evaluation notes that repeatedly state, "everything appears to be stable" and plaintiff's reports during these re-evaluations that her vision was improving and her symptoms were clearing up. [17-1] 20-21; [17-4] 299, 304-05, 307-08, 316, 323, 332; [17-6] 545; [17-7] 646-47. Here, the ALJ found evidence, including a significant number of records showing normal or improved visual examinations throughout the relevant period, that indicated that plaintiff's visual impairment was not severe. Whether the Court agrees with that conclusion is irrelevant, as what matters is that the ALJ built an "accurate and logical bridge" from the evidence to her conclusion that plaintiff did not have a severe impairment or combination of impairments." *See Craft*, 539 F.3d at 673.

Plaintiff contends the ALJ's opinion was not supported by substantial evidence, given the record evidence documenting her impairments and severe

limitations. For example, plaintiff notes in September 2016, her visual acuity was 20/400 and pinhole at 20/150 which plaintiff claims would render her disabled in occupations that require work with numbers or extensive reading. [20] 7 (citing [17-4] 305). Plaintiff also argues the ALJ's finding that plaintiff's vision gradually improved is undermined by plaintiff's re-evaluation notes from October 2016 where Dr. Garcia diagnosed plaintiff with severe metamorphopsia and reading at 20/50. [*Id.*] (citing [17-4] 314). Finally, plaintiff points out that the ALJ did not discuss that plaintiff's vision worsened between August 2017 and August 2018, where plaintiff's left eye vision went from 20/70-2 to 20/250. [*Id.*] 8 (citing [17-6] 518; [17-7] 667).

However, the fact that there may be some record evidence contrary to the ALJ's conclusion is not itself a basis for remand, as this Court is not permitted to reweigh the evidence, but instead must simply determine whether substantial evidence supports the ALJ's decision. *See*, *e.g.*, *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997) (noting that "where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the Court mist defer to the Commissioner's resolution of that conflict.); *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018) ("Although this Court reviews the record as a whole, it cannot substitute its own judgment for that of the SSA by reevaluating the facts or reweighing the evidence to decide whether a claimant is in fact disabled.") (internal citations and quotations omitted). The ALJ here considered plaintiff's testimony and medical records documenting plaintiff's vision throughout the relevant period, including the treatment records to which plaintiff points, but found that, based on her review of the entire record, plaintiff's vision impairments were not severe. It is not this Court's role to second guess this determination, but simply to determine whether it was supported by substantial evidence. Given the records throughout the relevant period to which both the ALJ and plaintiff pointed, which demonstrate plaintiff's vision health was regularly stable and improving or normal, the Court finds the ALJ's determination that plaintiff's vision impairments are not severe is supported by substantial evidence.

As to plaintiff's suggestion that the ALJ "cherry-picked" reports that support a non-disability finding, a read of the ALJ's decision demonstrates this is untrue. [20] 6-9. The Court will not go through each detail plaintiff alleges the ALJ omitted in her decision. However, the Court highlights that the ALJ did mention that plaintiff reported symptoms including: blurriness, "bubbles," light sensitivity, double vision, intermittent black dots, "floaters," halo effect, eye pain, and redness. [17-1] 20 (citing [17-4] 319, 331; [17-7] 51). The ALJ's decision also discusses plaintiff's diagnoses, such as, conjunctivitis, cataract, retinal detachment, and metamorphopsia, and the surgeries plaintiff underwent to address them. [*Id.*] 20-21 (citing [17-3] 283, 293; [17-6] 506, 559; [17-7] 51). Lastly, the Court notes the ALJ did include most of plaintiff's eye exam results from August 2016 through August 2018, including right and left eye, pinhole, and distance vision. [*Id.*] (citing [17-3] 292; [17-4] 314, 328-29; [17-6] 518-19, 544; [17-7] 644, 667). Here, the ALJ did not err in concluding that despite the

15

evidence plaintiff points out, in consideration of the whole record, plaintiff's vision impairment is not severe. *See Denton v. Astrue*, 596 F.3d 419, 425-26 (7th Cir. 2010) (affirming ALJ's denial of disability benefits where the ALJ did not error when he addressed evidence claimant argued he ignored and attributed such evidence with less significance than claimant preferred). The Court finds the ALJ sufficiently reviewed and discussed the medical evidence concerning plaintiff's vision impairments, including evidence favorable to plaintiff, and built an accurate and logical bridge to her conclusion that plaintiff's vision impairments were not severe.

## II.  The ALJ Did Not Commit Any Legal Error in Weighing the Opinions of Dr. Garcia or the State Agency Consulting Physicians.

In addition to generally arguing that the ALJ failed to build the requisite logical bridge between the evidence and her conclusion, plaintiff argues the ALJ erred in finding state agency physicians' opinions "persuasive" and treating physician Dr. Garcia's opinion "not persuasive." [17-1] 21; [20] 11-12, The Court addresses plaintiff's arguments with respect to each opinion below.

### a.  The ALJ Did Not Err in Finding Dr. Garcia's Opinion Not Persuasive.

In general, a "treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is 'well supported' by medical findings and "not inconsistent with the other substantial evidence" in the record." *Sonji L. v. Kijakazi*, No. 19 C 4109, 2022 WL 672741, at *5 (N.D. Ill. Mar. 7, 2022) (quoting 20 C.F.R. § 404.1527(c)). "If a treating physician's opinion is not given controlling weight, the ALJ must determine what weight it merits by considering the following factors: (1) the length, nature, and extent of the treatment relationship; (2) the frequency of examination; (3) the physician's specialty; (4) the consistency and supportability of the opinion." *Id.* (citing *Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018); 20 C.F.R. § 404.1527(c)). Further, the ALJ "must offer good reasons" for giving a treating physician's opinion less than controlling weight. *See Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016). However, while the ALJ must "consider the factors found in 20 C.F.R. § 404.1527(c)," she need only "minimally articulate" her reasoning, and the ALJ "need not explicitly discuss and weigh each factor." *Collins v. Berryhill*, 743 F. App'x 21, 25 (7th Cir. 2018) (citing *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (noting that this is a "very deferential standard" which the Seventh Circuit has described as "lax.").

Plaintiff claims the ALJ failed to credit treating physician Dr. Garcia's opinion that plaintiff had not achieved maximal medical improvement and was limited to lifting 20 pounds and carrying 10 pounds. [20] 12 (citing [17-5] 429). Plaintiff argues the ALJ erred for three reasons when the ALJ concluded Dr. Garcia's opinion was not persuasive. First, plaintiff contends the ALJ failed to assess any of the 20 C.F.R. §

404.1527(c) factors when rejecting the opinion. [*Id.*]. Second, plaintiff claims the ALJ's logic for discounting Dr. Garcia's opinion, namely because the lifting restriction was temporary, is hard to follow considering that after this assessment plaintiff's left eye functioning declined, and additional surgery was advised. [*Id.*] (citing [17-6] 518; [17-7] 644, 660-61, 667). Finally, plaintiff argues the ALJ incorrectly claimed Dr. Garcia did not identify a basis for plaintiff's lifting restriction where common sense would dictate that he based the restriction on her vision issues given that Dr. Garcia is an ophthalmologist. [27] 6. Plaintiff's arguments are without merit.

An ALJ does not err when she denies a treating physician's opinion controlling weight when the physician does not explain or offer supporting evidence for the opinion. *See Flynn v. Astrue*, 563 F. Supp. 2d 932, 945 (N.D. Ill. 2008). "An opinion - whether it be judicial or medical or that of any expert has a significance proportioned to the sources that sustain it . . . An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zuniga v. Berryhill*, 2:17-CV-251, 2019 WL 2754969, at *5 (N.D. Ind. July 2, 2019) (quoting *Huey v. United Parcel Service, Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999)). In *Flynn*, the court found the ALJ's decision not to credit the treating physician's opinion with controlling weight was supported by substantial evidence because the opinion came from a brief questionnaire that he completed that "did not go into any depth regarding his treatment" of the claimant and the physician had no treatment notes to support his opinion. 563 F. Supp. 2d at 944-45. The Court finds the result in *Flynn* instructive given the nature of Dr. Garcia's opinion.

Here, Dr. Garcia's opinion is found on a physician statement for plaintiff's life insurance company and takes the form of two checked boxes. [17-5] 429. Just like in the treating physician in *Flynn*, Dr. Garcia did not explain his opinion or provide evidence in support–the statement is a total of two pages long. [*Id.*] 428-29. A checked box is not enough for an expert's opinion, even that of a treating physician, to deserve controlling weight in the absence of supporting findings or explanation. *See Zuniga v. Berryhill*, 2019 WL 2754969, at *5 (ALJ decision not to give treating physician's opinion controlling weight was correct where opinion took "the form of a checked blank" and the physician did not explain his opinion, give any reason for reaching the opinion, or provide background evidence in support). None of Dr. Garcia's treatment notes that span over two years mention this lifting and carrying restriction or plaintiff's failure to reach maximal medical improvement. *See Gildon v. Astrue*, 260 F. App'x 927, 929 (7th Cir. 2008) ("An ALJ is not required to accept a doctor's opinion if it "is brief, conclusory, and inadequately supported by clinical findings."); *Ephrain S. v. Berryhill*, 355 F. Supp. 3d 738, 746 (N.D. Ill. 2019) ("an ALJ can reject a doctor's opinion if it is not supported by treatment notes or the record as a whole") (internal citations omitted). Given the lack of evidence and explanation to support Dr. Garcia's opinion, the ALJ's decision not to credit Dr. Garcia's opinion is supported by substantial evidence.

The ALJ adequately explained her reasoning for discounting Dr. Garcia's opinion. An ALJ who does not afford a treating physician's opinion controlling weight must then determine what weight it does merit by considering the factors outlined in 20 C.F.R. § 404.1527(c). *Sonji L.*, 2022 WL 67241, at *5 (citing *Gerstner*, 879 F.3d at 263). The ALJ's decision notes, that "Dr. Garcia does not specify whether the lifting restriction was related to the claimant's recent surgery or identify any other basis for the restriction." [17-1] 21. The ALJ's reasoning goes directly toward one of those factors: "the consistency and supportability of the opinion." *See id*; 20 C.F.R. § 404.1527(c)(3)-(4). The ALJ's explanation thus considered the regulatory factors to conclude that Dr. Garcia's opinion was not persuasive. [17-1] 21. That is all that is required. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (ALJ may discount a treating physician's medical opinion "as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."). To be sure, the ALJ's opinion here could have been more thorough and provided a more detailed analysis of all the relevant factors. But, while the ALJ must consider the relevant factors discussed above, the Seventh Circuit case law is clear that she need not explicitly discuss and weigh each factor. *See Collins*, 743 F. App'x at 25 (citing *Elder*, 529 F.3d at 415). Contrary to plaintiff's suggestion, the ALJ was not required to conduct a systematic analysis wherein she first explained why she was not offering Dr. Garcia's opinion controlling weight, and then reviewed and weighed each of the applicable factors to determine the weight it should be afforded. The Court finds the ALJ satisfied the requirement that she consider the regulatory factors and minimally articulate her reasoning, and therefore her decision to find Dr. Garcia's opinion not persuasive must stand.

### b. The ALJ Did Not Err in Finding the State Agency Physicians' Opinions Persuasive.

Plaintiff argues the ALJ committed a similar error when the ALJ found persuasive the opinions of two state agency physicians that plaintiff's vision impairments are not severe. [20] 11. Plaintiff argues the physicians' opinions are outdated because plaintiff's vision declined after the physicians' completed their assessments. [*Id.*]. Specifically, plaintiff contends Dr. Madala reviewed plaintiff's medical records through August 2017, but records thereafter, from April and August 2018, demonstrate plaintiff's vision worsened. [*Id.*] (citing [17-7] 644, 660-61, 667).

An ALJ is permitted to assign weight to a non-treating physician's opinion based on the regulatory factors discussed above, including the "claimant's examining and treatment relationship with the source of the opinion; the physician's specialty; the support provided for the medical opinion; its consistency with the record as a whole and any other factors that tend to support or contradict the opinion." *Bailey v. Colvin*, No. 3:14-CV-1079-CAN, 2015 WL 4093347, at *4 (N.D. Ind. July 7, 2015) (internal citations omitted). This process applies to opinions by state agency physicians. *Id.*

18

At the outset, the Court notes that plaintiff assumes Dr. Madala reviewed records through August 2017, however, it is equally plausible to find Dr. Madala reviewed available records through the date of her assessment, March 21, 2018. [17-1] 73-79. Dr. Madala received reconsideration evidence up through March 6, 2018. [*Id.*] 75. Further, at plaintiff's January 2018 appointment with Dr. Garcia, that immediately preceded the April 2018 appointment, her vision tested 20/20 in her right eye and she had a full visual field. [17-6] 544. Dr. Madala's conclusion reads, "[o]n reconsideration the claimant['s] vision remain 20/20-2 OD with full VF." [17-1] 79. Thus, Dr. Madala's conclusion, that tracks with the results of plaintiff's January 2018 appointment, indicates she reviewed the most recent medical records available to her when she completed her assessment.

The issue then is whether the ALJ was entitled to rely on Dr. Madala's opinion to find plaintiff's vision impairments are not severe, although plaintiff's vision worsened after Dr. Madala rendered her opinion. The Court concludes the ALJ was entitled to rely on Dr. Madala's opinion considering evidence pertaining to plaintiff's worsened vision documented that plaintiff's condition significantly improved and her vision was stable. "An ALJ may rely on a reviewing physician's assessment unless later evidence containing new, significant, medical diagnoses 'changed the picture' so much that it reasonably could have changed the reviewing physician's opinion." *Massaglia v. Saul*, 805 Fed. App'x 406, 410 (7th Cir. 2020) (quoting *Stage*, 812 F.3d at 1125). The new evidence pertaining to plaintiff's worsened vision in April and August 2018 reflects that plaintiff continued to have a normal visual field. [17-7] 644, 660. In April 2018, Dr. Haddadin's treatment notes state that plaintiff's condition "again, dramatically improved" and that her vision, including pinhole vision, was "actually better" [17-7] 646-47. Similarly, in August 2018, Dr. Giovingo, reported plaintiff's condition was "stable without change" and vision was "stable." [*Id.*] 661. The ALJ documents and discusses both plaintiff's April and August 2018 examinations. [17-1] 21. Because the records Dr. Madala did not review reflect significant improvement in plaintiff's condition, the evidence likely would not have changed the physician's opinion that plaintiff's vision impairments are not severe. *See Massaglia*, 805 Fed. App'x at 409-10 (ALJ did not err in relying on outdated opinions of state-agency doctors where new evidence, although it showed reinjury, also reflected significant improvement in plaintiff's condition). Here, the ALJ carefully considered the evidence the state-agency physicians did not review and reasonably concluded that the physicians' assessments are consistent with the record as a whole. [17-1] 20. The ALJ thus, did not commit reversible error by relying on the state-agency physicians' opinions to find that plaintiff's vision impairments are not severe.

## III. The ALJ's Credibility Determination Was Not Patently Wrong.

Finally, plaintiff argues the ALJ erred in her assessment of the credibility of plaintiff's subjective statements and testimony related to her impairments. [20] 9-11.

Specifically, plaintiff argues the ALJ failed to explain inconsistencies between plaintiff's daily activities, subjective complaints, and the medical evidence, and failed to address the reasons plaintiff did not pursue treatment for her depression. [*Id.*]. The Court finds the ALJ's analysis of plaintiff's subjective complaints is supported by the record and does not provide a basis for remand.

This Court generally must accord "special deference" to the ALJ's credibility determination, because she "is in the best position to see and hear the witness and determine credibility." *Crawford v. Astrue*, 633 F. Supp. 2d 618, 631 (N.D. Ill. 2009) (citing *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)). For that reason, the Court may only overturn the ALJ's adverse credibility determination if it is "patently wrong." *Elder*, 529 F.3d at 413-14. A credibility determination is "patently wrong" if it "lacks any explanation or support." *Id.* An ALJ's determination regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers, the weight the adjudicator gave to the individual's statements and the reasons for that weight." *See* SSR 96-7p 1996 WL 374186, at *4 (S.S.A. 1996).

Plaintiff first alleges the ALJ failed to explain inconsistencies among plaintiff's daily activities, plaintiff's subjective complaints, and medical evidence in the record. [20] 10. An ALJ may consider whether a claimant's daily activities are inconsistent with plaintiff's alleged inability to work. *See* 20 C.F.R. § 404.1529(c)(3)(i); *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). Further, an ALJ may not ignore a claimant's limiting qualifications regarding her daily activities. *Jones*, 623 F.3d at 1162 (citing *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009)). Here, the ALJ considered the qualifications plaintiff placed on her daily activities. While the ALJ could have discussed plaintiff's daily activities in more detail, she did not exaggerate plaintiff's testimony regarding these activities. The ALJ noted plaintiff does not feel comfortable driving, has to rest her eyes after reading for twenty minutes, has difficulty watching television, and does everything with her left eye closed. [17-1] 19-20.

The ALJ went onto explain that plaintiff's alleged qualifications, that is her limitations, were inconsistent with her daily activities. [*Id.*] 20. The ALJ pointed out at least three inconsistencies, including that: plaintiff stated she does not feel comfortable driving but acknowledged that no doctors told her she could not drive; plaintiff said she has difficulty watching television and problems looking at a computer screen but testified that she can use her smartphone without difficulty and might be able to perform her former job if she had a large computer screen; and plaintiff said she could read only twenty minutes at a time, but also said she could read for up to four hours a day. [*Id.*] (citing [17-1] 47-49, 51). Plaintiff invites us to reweigh the evidence and arrive at a different conclusion–that plaintiff's alleged limitations in performing daily activities demonstrate that her mental and physical

impairments are disabling. The Court cannot substitute its judgment for the ALJ's when considering the weight of the evidence, and plaintiff must do more than point to a different conclusion that the ALJ could have reached to demonstrate that the credibility determination was patently wrong. *See Jones*, 623 F.3d at 1162 (citing *Ketelboeter v. Astrue*, 550 F. 3d 620, 624 (7th Cir. 2008)).

Regarding plaintiff's lack of treatment, plaintiff is correct as a general matter that an ALJ must inquire into a claimant's reasons for not seeking medical treatment before drawing negative inferences from it, including, for example, a lack of health insurance or inability to pay. *See, e.g., Wherry v. Colvin*, No. 15-cv-419-CJP, 2016 WL 3570596, at *7 (S.D. Ill. July 1, 2016) ("It is true that an ALJ must consider a claimant's lack of health insurance before concluding that a failure to seek treatment means that treatment was not needed"); *Senn v. Astrue*, No. 12-c-326, 2013 WL 639257, at *5 (E.D. Wis. Feb. 21, 2013) ("SSR 96-7p cautions the ALJ about drawing adverse inferences from a lack of treatment without first taking into account a claimant's explanation such as lack of access to free or low-cost medical services"). However, "this does not translate into a blanket rule that an ALJ must accept as credible all allegations of a claimant who is without health insurance," nor that the ALJ is required to accept plaintiff's reasoning." *Wherry*, 2016 WL 3570596, at *7. All that is required is that the ALJ consider those reasons and "provide an 'accurate and logical bridge' between the evidence and conclusion." *Senn*, 2013 WL 639257, at *5 (citing *Craft*, 539 F.3d at 673).

Here the ALJ discounted plaintiff's symptom allegations related to her depression because plaintiff had not currently received treatment for her mental health issues during the relevant time period and plaintiff did not mention her mental impairments when she testified at the administrative hearing. [17-1] 21-22. At the hearing, plaintiff did state she does not have medical benefits or insurance but, in the context of discussing her alleged physical impairments plaintiff testified:

A: I had seen Dr. Miller at DuPage Medical Center and I told him that . . . my foot has been asleep for two months. . . And so, now I have it all the way up to my knee every day, all the time, and it's in my right foot too, but not as intense. But after I walk, I hurt.

Q: Why haven't you seen another doctor?

A: I don't have medical benefits or insurance.

Q: When's the last time you had medical insurance?

A: When I had my eye surgery. 2016. And then they cut me off.

[*Id.*] 52.

21

The ALJ should have addressed plaintiff's explanation explicitly in reaching her credibility determination. *See Roddy v. Astrue,* 705 F.3d 631, 638 (7th Cir. 2013) (citing SSR 96-7p, 1996 WL 374186, at *8). Nonetheless, an ALJ's failure to consider plaintiff's explanation for a lack of health insurance is not patently wrong where she has "other good reasons for not crediting plaintiff's subjective complaints as evidence that she had a disabling condition." *Dobbratz v. Colvin,* No. 12-cv-786-bbc, 2013 WL 3884257, at *5 (W.D. Wis. July 26, 2013) (citing *Elder,* 529 F.3d 413-14). Here, the Court notes that, contrary to plaintiff's testimony, medical evidence in the record shows plaintiff had health insurance through at least March 2017 and she continued to see an ophthalmologist for treatment through August 2018. [17-4] 328; [17-7] 664. Thus, the ALJ logically could conclude from the evidence of record that if plaintiff had health insurance through March 2017 and obtained treatment for her vision while she was uninsured, she could have sought at least some mental health treatment for her depression between her disability onset date of August 26, 2016 and March 2017. *Id.* As the ALJ noted, plaintiff provided no evidence of mental health treatment during this period. [17-1] 20-21; *see Scheck v. Barnhart,* 357 F.3d 697, 702 (7th Cir. 2004) ("you must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled") (quoting 20 C.F.R. § 404.1512(c)). Further, as explained above, plaintiff's reported daily activities were inconsistent with the alleged severity of her symptoms.

The Court therefore concludes the ALJ accurately represented plaintiff's daily activities and found that plaintiff's impairments were not as severe as plaintiff alleged and that the ALJ's findings were proper, given the lack of medical evidence available, with respect to plaintiff's depression. The ALJ was not patently wrong in her credibility determination.

## Conclusion

For the foregoing reason, plaintiff's request to reverse the SSA's decision and remand this case to the agency [20] is denied, and the Commissioner's motion for summary judgment [25] is granted, and the Commissioner's decision denying Plaintiff's application for benefits is affirmed.

*Heather K. McShain*

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: February 9, 2023**